FILED
**United States Court of Appeals
Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**May 31, 2022**

**Christopher M. Wolpert
Clerk of Court**

CORE PROGRESSION FRANCHISE
LLC, a Colorado limited liability company,

    Plaintiff - Appellee,

v.

CHRIS O'HARE, an individual; CAO
ENTERPRISES, INC., a North Carolina
corporation,

    Defendants - Appellants.

No. 21-1151
(D.C. No. 1:21-CV-00643-WJM-NYW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **CARSON**, and **ROSSMAN**, Circuit Judges.
_____

Chris O'Hare entered into a franchise agreement with fitness chain Core

Progression. Core Progression is based in Denver, and most of its franchises are in

Colorado. In September 2019, O'Hare agreed to open Core Progression's first franchise

in North Carolina. But after only a few months of operation, O'Hare became frustrated

with Core's business model and the benefits the franchise provided. He stopped paying

fees to Core Progression and prepared to open his own gym under a different name in the

same location where he ran the Core Progression franchise. In addition, he tried to access

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Core Progression's clients and convert them to his new facility. When Core Progression learned of these violations, it terminated the franchise agreement.

Core Progression sued to enjoin O'Hare from opening a competing gym in its former franchise location, and the district court granted a preliminary injunction under Federal Rule of Civil Procedure 65(a). O'Hare filed this interlocutory appeal. We agree with the district court that O'Hare likely violated the non-compete provisions of the franchise agreement, and that sufficient evidence supported the grant of a preliminary injunction. Accordingly, we AFFIRM.

## I.    BACKGROUND

After an evidentiary hearing, the district court found the following facts. Over several months in 2019, Core Progression CEO Jonathan Cerf and O'Hare engaged in a negotiation over the North Carolina franchise agreement. O'Hare claims Cerf told him the Core fitness regimen was revolutionary, the franchise all but guaranteed high profit margins, and O'Hare would surely recoup his initial investment quickly.

O'Hare agreed to open the franchise, but he did not immediately sign a contract. Instead, Core Progression gave O'Hare the preliminary franchise agreement to review two months before execution. In the franchise agreement, O'Hare agreed to not operate a competing gym within 25 miles of his Core Progression franchise for one year after the termination of the franchise.[1]

---

[1] The franchise agreement, signed by O'Hare, states that "[N]either [O'Hare nor his affiliates] will have [sic] for the period of one year . . . in any manner whatsoever, carry on . . . any Competitive Business . . . within a 25 mile radius of the

When Core Progression presented the final agreement for signature, a few clauses had changed. The changed clauses related to issues like equipment ownership, and none are at issue in this appeal. Further, the changed clauses were not material to O'Hare's decision to sign with the agreement.[2] Thus, both parties agreed that O'Hare would operate a Core Progression franchise and be subject to all benefits and limitations in the franchise agreement.

Shortly after O'Hare opened his Core Progression location through his corporation CAO Enterprises, he decided the system was not so "revolutionary" after all. He wanted to end the franchise, claiming that it was "fake" and had provided him with nothing of value.

But Core Progression established that it provided O'Hare with valuable trade secrets, training, and branding. In fact, O'Hare downloaded Core Progression's client data, copied its website formatting for his new gym, and used its goodwill to recruit his own clients. He started his new gym, Altru Fitness, by simply changing the names on Core Progression's social media accounts, maintaining all of Core Progression's photos

---

Core Progression Business." Aplt. App. at 71. This clause appears in both the preliminary and final agreements.

[2] O'Hare testified, in a conclusory manner, that the changes were "material." But "[a]t no point did O'Hare testify that, had these changes been brought to his attention prior to his execution of the Franchise Agreement, he would have changed his conduct during contract negotiations, refused to sign the Franchise Agreement, or made a counteroffer to Plaintiff based on the differences." Aplt. App., Vol. X at 2427. Thus, though O'Hare said the word "material," his testimony indicated that the changes were immaterial.

and reviews.  The new titles, "Altru Fitness (formerly Core Progression)," implied that the business had only changed names.

O'Hare stipulated to an injunction preventing him from using the Core Progression brand, and he agreed to return any items belonging to Core Progression.  But he appeals the preliminary injunction directing him to cease operating a gym at the current location (or within 25 miles) and to cease the use of Core Progression trade secrets and information.

## II.    ANALYSIS

The district court granted a preliminary injunction prohibiting O'Hare from operating Altru Fitness at the current location or using Core Progression's trade secrets.

We review the grant of a preliminary injunctions for abuse of discretion.  *United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 889 (10th Cir. 1989); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). A district court's decision crosses the abuse-of-discretion line if it imposes a preliminary injunction based on an erroneous legal conclusion or without a rational factual basis in the record.  *Id.* (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)).  Here, the district court applied the correct law, and its factual findings had rational bases in the record.  Thus, we find that it did not abuse its discretion in issuing a preliminary injunction against O'Hare.

### A.  Preliminary Injunction

To obtain a preliminary injunction, Core Progression had to show: (1) a substantial likelihood of success on the merits, (2) that irreparable injury will result absent the

4

injunction, (3) that the threatened injury outweighs the harm to O'Hare, and (4) that the injunction is not adverse to the public interest. *Free the Nipple v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citing *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)). An injunction that changes the status quo, moreover, is disfavored and requires "a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors." *Id.* at 797.

1.       *Likelihood of Success on the Merits*

The district court concluded Core Progression has a high likelihood of success on the merits, based on the facts presented to it. First, O'Hare plainly violated the enforceable noncompete provision of the franchise agreement.[3] The district court found that O'Hare effectively conceded he breached the franchise agreement, and this finding has a basis in the record—O'Hare openly ran a new gym in the same location as the Core Progression gym before and immediately after Core Progression terminated the franchise

---

[3] Colorado law bars the enforcement of some noncompete agreements. C.R.S.A. § 8-2-113(2). But it allows enforcement of noncompete agreements against management personnel. C.R.S.A. § 8-2-113(2)(d). O'Hare argues that he was not an employee of Core Progression and so could not have been management personnel. But O'Hare was a manager of his own Core Progression franchise, and thus he may be subject to a noncompete agreement. *See Fitness Together Franchise, LLC v. EM Fitness, LLC*, No. 20-cv-02757, 2020 WL 6119470, at *9 (D. Colo. Oct. 16, 2020) (franchise owner is management personnel). Alternatively, the enforcement could also be authorized under § 8-2-113(2)(a), which allows noncompete agreements related to the sale of a business—here, Core Progression sold a franchise business to O'Hare. *See, e.g.*, *I Can't Believe It's Yogurt v. Gunn*, No. 94-ok-2109, 1997 WL 599391, at *21 (D. Colo. Apr. 15, 1997) ("[T]he purchase of a franchise is analogous to the purchase and sale of a business or the assets of a business"). Finally, it could be authorized under § 8-2-113(2)(c), which allows noncompete agreements for the protection of trade secrets. As discussed *supra*, protection of trade secrets is an essential part of the franchise agreement at issue.

agreement. Aplt. App. at 2425. O'Hare also tried to obtain Core Progression's client data for use in his new gym, Altru Fitness. Aplt. App. at 2425-26. The district court's finding that O'Hare breached the agreement has a firm basis in the record.

O'Hare argues that even if he breached the franchise agreement, Core Progression should lose on the merits because the agreement is not an enforceable contract. He contends the agreement is not enforceable because (1) Core Progression withheld material provisions during negotiations, and (2) O'Hare relied on Jonathan Cerf's misrepresentations in entering the agreement. The district court considered these arguments and found them to be unsupported by the record. As to the change in provisions from the advance copy of the agreement, O'Hare testified that the provisions would not have influenced his decision to sign the contract. Thus, the district court's finding that the provisions were not material has a basis in the record. Further, it found that O'Hare was not mislead by any statements during negotiations, and that Cerf's generic assurances that the franchise would be a great success were puffery, not material misrepresentations. The district court correctly found that Core Progression had a high likelihood of success on the merits.

## 2. *Irreparable Injury*

O'Hare also contends that Core Progression suffered no injury that cannot be compensated in money damages. Thus, he argues that an injunction is inappropriate relief. But there is a basis in the record for the district court's finding that Core

6

Progression sufficiently alleged ongoing harm that it cannot be adequately compensated for in money damages.

O'Hare contends Core Progression has no intention of opening another location in North Carolina. He argues that its only injury, if any, was the damage to the franchise's reputation in the North Carolina area. Core Progression argues that in addition to any reputational injury, it was also injured by the O'Hare's continuing use of its trade secrets, which are its exclusive property.

To be sure, a simple breach of contract is not sufficient to constitute irreparable injury to Core Progression. Instead, when determining whether a party will suffer irreparable injury, a district court may consider: "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004).

The district court found that, without a preliminary injunction, Core Progression would suffer irreparable injury. The district court mentioned that some trial courts apply a presumption of harm in franchise cases like this one. Op. Br. at 78. But it went on to quantify the specific harm to Core Progression. It held O'Hare's use of Core Progression's training system and marketing injured the franchise, as did Altru Fitness's perceived (but false) affiliation with Core Progression.[4] The continued operation of Altru

---

[4] This finding has a basis in the record: Core Progression's CEO testified that "to teach somebody all of my systems, give them access to all of our market

Fitness conveyed to consumers that Core Progression really was a "fake franchise." Aplt. App. at 2450. Finally, the court concluded that although Core Progression did not yet have any other locations in North Carolina, it had reasonably relied on the expectation that O'Hare's successful franchise would facilitate expansion in the state. With O'Hare's damaging competition removed, Core Progression can restart its business in North Carolina, as it alleges it intends to.

These findings are supported by the record, and the district court did not abuse its discretion in finding irreparable injury.

### 3. Balance of Harm

Because Core Progression demonstrated it would suffer loss of its trade secrets and damage to its business absent an injunction, the district court found that the balance of harms favored issuing a preliminary injunction. In balancing harms, a court looks at whether the moving party's "threatened injury outweighs the injury the opposing party will suffer under the injunction." *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 889 (10th Cir. 2013) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)).

O'Hare argues that because he is not able to participate in his chosen profession of gym ownership, his harm outweighs the harm to Core Progression. It is true that O'Hare will not be able to open a fitness facility within 25 miles of the former franchise, which temporarily limits his career outcomes if he is unwilling to relocate. But O'Hare agreed

---

proprietary training, work on developing their location for a year, see [our] great success and then have the name be tarnished . . . it makes it look like my brand went to North Carolina and failed and was a fraud." Aplt. App. at 2429.

to this provision when he signed the franchise agreement. Harms that a party brings on himself generally bear less weight in this balancing analysis. *See Fitness Together Franchise, LLC v. EM Fitness, LLC*, No. 120CV02757DDDSTV, 2020 WL 6119470, at *11 (D. Colo. Oct. 16, 2020) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson*, 290 F.3d 578, 596 (3d Cir. 2002)). Thus, the district court found that the risk of harm to Core Progression was more substantial than the risk of harm to O'Hare. This finding is supported by the record.

O'Hare also argues that the district court failed to consider the harm to his First Amendment rights. He believes the preliminary injunction is a prior restraint designed to restrict his First Amendment rights, even though he concedes that it does not explicitly forbid him from any form of speech. He argues that because the preliminary injunction is designed to prevent further harm, including from his own damaging statements, it curtails his future speech. The only speech O'Hare must refrain from is divulging Core Progression's proprietary trade information. This restriction does not run afoul of the First Amendment, and courts regularly uphold prohibitions on sharing trade secrets. *See, e.g.*, *Harvey Barnett, Inc. v. Shidler*, 200 F. App'x 734, 73940 (10th Cir. 2006). There is no harm to O'Hare's protected First Amendment interests. The district court did not abuse its discretion in finding that the balance of harms favors Core Progression.

### 4. *Public Interest*

Finally, the district court correctly found that an injunction was not adverse to the public interest. Colorado law expressly mandates that enforceable noncompete agreements further state policy, and it demonstrates that the public interest tilts in favor

9

of enforcement where a violation has been established. *See, e.g.*, C.R.S.A. § 8-2-113 (authorizing noncompete agreements for "management personnel"). Thus, the court concluded promptly enforced noncompete agreements are in the public interest. We agree.

\*   \*   \*

In sum, all four preliminary injunction factors favor the grant of an injunction: Core Progression is likely to prevail on the merits of this case, it will face ongoing harm in the absence of a preliminary injunction, that harm is more significant than the harm to O'Hare, and a preliminary injunction is in the public interest. Thus, the district court did not abuse its discretion in granting the injunction.

We AFFIRM.

### III.    CONCLUSION

For the reasons stated above, we AFFIRM the decision of the district court.


Entered for the Court

Timothy M. Tymkovich
Chief Judge