**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BELTRONICS USA, INC.,

        Plaintiff - Appellee,

    v.

MIDWEST INVENTORY
DISTRIBUTION, LLC; I-NET
DISTRIBUTORS, LLC; AUDIO
VIDEO MAN; KEVIN BURKE;
STEVE WEBB,

        Defendants - Appellants.

No. 07-3340

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D. Ct. No. 2:07-CV-02440-JWL-GLR)**

---

Derek T. Teeter (Maxwell Carr-Howard, with him on the briefs), Husch Blackwell
Sanders LLP, Kansas City, Missouri, appearing for Appellants.

Brett A. Schatz (Thomas W. Flynn, with him on the brief), Wood, Herron &
Evans, L.L.P. Cincinnati, Ohio, appearing for Appellee.

---

Before **TACHA**, **BRISCOE**, and **O'BRIEN**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

        Defendants-Appellants are a consumer electronics company, its owners,

and its trade names (collectively, "Midwest").  Plaintiff-Appellee ("Beltronics") is a provider of aftermarket vehicle electronics, including radar detectors. Midwest appeals the district court's order preliminarily enjoining it from selling Beltronics equipment not bearing an original Beltronics serial number label.  *See* Lanham Act, § 34(a), 15 U.S.C. § 1116(a).  We have jurisdiction under 28 U.S.C. § 1292(a)(1) and AFFIRM.

## I. BACKGROUND

As early as 2003, Beltronics began selling electronics equipment under its Beltronics trademark.  At all times relevant to this case, Beltronics sold its equipment to at least two authorized distributors who agreed to sell the products for a specified minimum price.  Apparently in violation of their distribution agreements, those distributors sold Beltronics radar detectors to Midwest, which in turn resold them as "new" on the internet auction site eBay.  To prevent Beltronics from discovering that Midwest's inventory had been supplied by the two distributors, the distributors either replaced each radar detector's original serial number label with a phony label or removed the original label altogether before shipping equipment to Midwest.  On rare occasions, when the distributors supplied Midwest with a radar detector bearing an original serial number label, Midwest removed the label prior to resale.

It is Beltronics's policy that only those who purchase Beltronics radar detectors bearing an original serial number label are eligible to receive certain

- 2 -

products and services, including software upgrades, rebates, product use information, service assistance, warranties, and recalls. Beltronics learned that its radar detectors were being sold without original serial labels when Midwest's purchasers contacted Beltronics with warranty requests for detectors that had phony serial numbers. A Beltronics customer service manager submitted an affidavit stating that those purchasers were confused, thinking that they were entitled to a warranty from Beltronics. The customer service manager further stated that the customers expressed their belief that they did not receive what they thought they had purchased and that Beltronics had deceived them. He explained that they became irate when they learned their radar detector was not covered by Beltronics's warranty and did not come with other services such as recalls and product upgrades, and that this is extremely harmful to Beltronics's reputation and goodwill.

In September 2007, Beltronics filed this action against Midwest. The complaint asserted (1) counterfeiting and federal trademark infringement under 15 U.S.C. § 1114; (2) false designation or origin under 15 U.S.C. § 1125; and (3) trademark infringement, unfair competition, and passing off in violation of state law. Beltronics also sought a preliminary injunction.[1] Following an evidentiary

---

[1]Beltronics also filed an ex parte application for a seizure order pursuant to 15 U.S.C. § 1116(d). After initially authorizing the seizure of certain goods and records in Midwest's possession, the district court held a hearing and determined, inter alia, that Beltronics had failed to demonstrate that Midwest "would destroy,
(continued...)

hearing on October 31, 2007, the district court determined that Beltronics had satisfied all of the necessary requirements for a preliminary injunction and enjoined Midwest from selling or offering for sale any Beltronics products that do not bear an original serial number label. Midwest filed a timely notice of interlocutory appeal.[2] *See* 28 U.S.C. § 1292(a)(1); Fed. R. App. P. 4(a)(1)(A).

## II. DISCUSSION

A.    Preliminary Injunction Standard of Review

To prevail on a motion for a preliminary injunction, the movant must establish that four equitable factors weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *See Westar Energy*, *Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009). On appeal, Midwest challenges only the district court's determination that

---

[1](...continued)
move, hide, or otherwise make the seized goods inaccessible." *Beltronics USA, Inc. v. Midwest Inventory Distrib'n LLC*, 522 F. Supp. 2d 1318, 1323 (D. Kan. 2007). *See* 15 U.S.C. § 1116(d)(4)(B)(vii). It therefore dissolved the seizure order. *See Beltronics*, 522 F. Supp. 2d at 1324. That issue is not raised in this appeal.

[2]Midwest moved the district court to stay all other proceedings pending the resolution of this interlocutory appeal. The district court has granted that motion. *See Beltronics USA, Inc v. Midwest Inventory Distrib'n LLC*, 545 F. Supp. 2d 1188, 1190 (D. Kan. 2008).

Beltronics has a substantial likelihood of prevailing on the merits of its claim for trademark infringement. *See* Lanham Act, § 32, 15 U.S.C.A. § 1114.

We review the grant of a preliminary injunction for an abuse of discretion. *See Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231 (10th Cir. 2005). "A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1252 (10th Cir. 2006). Moreover, "because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003); *see also United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989) (stating that a preliminary injunction "constitutes drastic relief to be provided with caution . . . [and] should be granted only in cases where the necessity for it is clearly established."); *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) ("In general, a preliminary injunction . . . is the exception rather than the rule.") (quotations omitted).

We have also explained that injunctions that disrupt the status quo are disfavored and "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Schrier v. Univ. of Colo.,* 427 F.3d 1253, 1259 (10th Cir. 2005) (quotations omitted). An injunction disrupts the status quo when it changes the

"last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 1260. In such instances, the district court may not grant a preliminary injunction unless the plaintiff "make[s] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc). This heightened standard accords with the historic purpose of the preliminary injunction, which is to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). *See also O Centro*, 389 F.3d at 977 (stating that the purpose of a preliminary injunction "is to assure that the non-movant does not take unilateral action which would prevent the court from providing effective relief to the movant should the movant prevail on the merits").

Midwest argues that the district court's injunction disrupted the status quo between the parties because it compelled Midwest to cease selling Beltronics products on eBay. It thus contends that the district court was required to examine with extra scrutiny whether Beltronics is substantially likely to prevail on the merits of its trademark infringement claim. We need not decide this question, however, because even assuming the heightened standard applies in this case, Beltronics has met its burden.

B. Trademark Infringement Claim

Under § 32 of the Lanham Act, "[t]he unauthorized use of any reproduction,

counterfeit, copy, or colorable imitation of a registered mark in a way that is likely to cause confusion in the marketplace concerning the source of the different products constitutes trademark infringement." *First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 651 (10th Cir. 1996) (citing 15 U.S.C. § 1114(1)(a)). Thus, the central inquiry in a trademark infringement case is the likelihood of consumer confusion. *See Team Tires Plus, Ltd v. Tires Plus, Inc.*, 394 F.3d 831, 832 (10th Cir. 2005); *see also Australian Gold, Inc. v. Hatfield*, 436 F.3d at 1238 ("The party alleging infringement has the burden of proving likelihood of confusion."). Midwest argues that the district court erred both legally and factually in determining that Midwest's sale of Beltronics radar detectors is likely to cause confusion in the marketplace. First, Midwest claims that its sale of radar detectors under the Beltronics trademark is protected by the first sale doctrine and the district court committed an error of law in concluding otherwise. Alternatively, Midwest argues that even if the first sale doctrine does not apply, the district court's determination that its disclosure to consumers was insufficient to alleviate confusion involved errors of both law and fact. We evaluate each of these claims in turn.

1. *First Sale Doctrine*

Those who resell genuine trademarked products are generally not liable for trademark infringement. *See Davidoff & CIE, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1301 (11th Cir. 2001); *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506,

1509 (9th Cir. 1987). "The reason is that trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *NEC Elecs.*, 810 F.2d at 1509 (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368–69 (1924)). *See also United States v. Giles*, 213 F.3d 1247, 1252 (10th Cir. 2000) ("'[T]he purpose of trademark law is . . . to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute.'") (quoting *Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir. 1989)). Accordingly, under the "first sale" doctrine, "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Australian Gold*, 436 F.3d at 1240–41 (10th Cir. 2006) (quotations omitted). In our circuit's only case evaluating this doctrine in connection with a Lanham Act claim, we observed that "the essence of the 'first sale' doctrine [is] that a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Id.* at 1241 (quotations omitted).

It logically follows that the first sale doctrine is not applicable "when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner." *Davidoff*, 263 F.3d at 1302. A materially different product is not genuine and may generate consumer confusion about the source and

the quality of the trademarked product. *See id.*; *Gamut Trading Co. v. U.S. Int'l Trade Comm'n*, 200 F.3d 775, 779 (Fed. Cir. 1999); *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 303 (3d Cir. 1998).[3] We hold, as other federal circuit courts have held, that the unauthorized resale of a materially different trademarked product can constitute trademark infringement. *See Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 370 (6th Cir. 2007); *Davidoff*, 263 F.3d at 1302; *Iberia Foods*, 150 F.3d at 302–03; *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1302 (5th Cir. 1997); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 638–39 (1st Cir. 1992); *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir. 1987).[4]

---

[3] The Lanham Act was designed to protect both consumers and trademark owners from the effects of such confusion. *See* S. Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946) ("The purpose underlying [the Lanham Act] is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats. This is the well-established rule of law protecting both the public and the trade-mark owner.").

[4] We recognize that these cases and others cited in this opinion involve the sale of "gray market" goods—goods that bear a United States trademark, are authorized for exclusive production and sale in a foreign country, and are subsequently imported and sold in the United States without the trademark owner's consent. *See Gamut*, 200 F.3d at 778. The rationale in gray goods cases applies with equal force in this context. Thus, we agree with the Third and Eleventh Circuits that the rule "is not limited to gray goods cases." *Iberia Foods*,

(continued...)

We emphasize that not all differences are material.  *See Davidoff*, 263 F.3d at 1302.  Some differences between products "prove so minimal that consumers who purchase the alleged infringer's goods get precisely what they believed they were purchasing [and] consumers' perceptions of the trademarked goods are not likely to be affected by the alleged infringer's sales." *Iberia Foods*, 150 F.3d at 303 (quotations and citations omitted).  A guiding principle in evaluating whether a difference between two products bearing the same trademark is material is whether the difference "confuses consumers and impinges on the . . . trademark holder's goodwill." *Nestle*, 982 F.2d at 638.  For this reason, the materiality analysis must be undertaken "on a case-by-case basis," *see id.* at 641, and must include "an examination of the products and markets at issue." *Brilliance Audio*, 474 F.3d at 371.  Although no mechanical process exists for determining the threshold for materiality, *see Nestle,* 982 F.2d at 641, a difference is material if "consumers [would] consider [it] relevant to a decision about whether to purchase a product." *Davidoff*, 263 F.3d at 1302.  Because many factors influence such considerations, the threshold "must be kept low to include even subtle differences between products." *Id.*  We review de novo the question of whether differences

[4](...continued)
150 F.3d at 302; *Davidoff*, 263 F.3d at 1302 n.5.  *See also Gamut*, 200 F.3d at 778 ("The conditions under which gray-market goods have been excluded [from import into the United States]. . . reflect a legal recognition of the role of domestic business in establishing and maintaining the reputation and goodwill of a domestic trademark.").

between trademarked goods and goods sold by an alleged infringer are material. *Iberia Foods*, 150 F.3d at 303.

In support of its argument that the first sale doctrine applies in this case, Midwest contends that material differences are limited to differences in physical quality or in control procedures designed to ensure a trademarked product's physical quality at the time of resale. It asserts that the absence of Beltronics's warranties and other services are "collateral" to the radar detectors' physical quality, and therefore no material differences distinguish Beltronics's radar detectors from those sold by Midwest. Accordingly, Midwest claims the first sale doctrine shields it from liability under the Lanham Act.

In evaluating this line of reasoning, we turn again to what we have called "the essence of the 'first sale' doctrine," which is that "a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Australian Gold*, 436 F.3d at 1241 (quotations omitted). In this case, it is undisputed that something more than stocking, displaying, and reselling radar detectors is at issue. Additionally, although we have never had occasion to review whether differences in warranties or service commitments may constitute material differences, at least two federal circuit courts have held or observed that they may. *See SKF USA Inc. v. Int'l Trade Comm'n*, 423 F.3d 1307, 1312 (Fed. Cir. 2005); *Nestle*, 982 F.2d at 639 n.7. The Federal Circuit has held that "physical material

differences are not required to establish trademark infringement . . . because trademarked goods originating from the trademark owner may have nonphysical characteristics associated with them, including services, such that [the sale of] similar goods lacking those associated characteristics . . . may mislead the consumer and damage the owner's goodwill." *SKF*, 423 F.3d at 1312. Similarly, the First Circuit has observed that "the appropriate test [for materiality] should not be strictly limited to physical differences," but should include other differences such as "warranty protection or service commitments [that] may well render products non-identical in the relevant Lanham Trade-Mark Act sense." *Nestle*, 982 F.2d at 639 n.7. We are aware of no federal circuit court that has held or observed otherwise when considering the specific question of whether material differences may include warranties and service commitments. Accordingly, we conclude that the district court did not commit an error of law in concluding that material differences may include the warranties and services associated with Beltronics's radar detectors.

Midwest expresses concern about the policy implications for such a decision. It claims that this interpretation of the material difference exception to the first sale doctrine would permit any trademark owner to eliminate the resale of its goods, shut down its competitors, and ultimately fix the price of its product simply by limiting its warranty coverage and service commitments to those who buy from it directly. Because under this scenario those who purchase a

- 12 -

trademarked product from a reseller would not receive the same warranty and services as those who purchase from the trademark owner, Midwest asserts the product would be materially different and all resellers would be unavoidably and invariably liable under the Lanham Act.

Were the first sale doctrine the only legal principle shielding resellers from liability in this scenario, Midwest's argument might avail. *See Davidoff*, 263 F.3d at 1301 (observing that the first sale doctrine "does not hold true . . . when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner."). However, the fact that "the resale of a trademarked product that is materially different *can* constitute a trademark infringement," *see id.* at 1302 (emphasis added), does not mean that it always does. The Lanham Act does not proscribe material differences per se; it proscribes sales and offers for sale that are "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a)–(b). The purpose of the material difference test is to assist courts in determining whether allegedly infringing products are likely to cause confusion in the marketplace and undermine the goodwill the trademark owner has developed in its trademarked goods. *See Iberia Foods*, 150 F.3d at 303; *Nestle*, 982 F.2d at 638 (noting that the sale of materially different merchandise violates [the] Lanham Trade-Mark Act . . . because a difference in products bearing the same name confuses consumers and impinges on the . . . trademark holder's goodwill."). So long as resellers of materially different products take the

- 13 -

necessary steps to adequately alleviate this confusion and prevent injury to the trademark's goodwill—by, for example, sufficiently disclosing that the product differs from the originally sold product—those differences will be unlikely to trigger the liability Midwest envisions. *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999) ("Likelihood of confusion forms the gravamen for a trademark infringement action."); *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 591 (5th Cir. 1993) (explaining that in several cases where trademark infringement was associated with the resale of materially different goods, an essential element was that "a consumer would not necessarily be aware of the [differences] and would thereby be confused or deceived."). We therefore conclude that Midwest's policy argument is unavailing.

2. *Sufficiency of Disclosure*

Midwest argues that even if the Beltronics radar detectors its sells are materially different than those sold by Beltronics, Midwest included a disclosure in its advertisements sufficient to shield it from liability. Specifically, Midwest offered into evidence a printout from an auction on eBay that contained the following statement:

> WARRANTY – WE PROVIDE A 1 YEAR DEFECTIVE REPLACEMENT WARRANTY. THE MFG WILL NOT HONOR THE WARRANTY IF PURCHASED OFF EBAY. SINCE WE HONOR THE WARRANTY, THE SERIAL NUMBER HAS BEEN REMOVED AND RETAINED BY US.

The district court rejected this argument, stating:

- 14 -

According to defendants, when they advertise their product on the Internet they disclose that the manufacturer will not honor the manufacturer warranty and that, in lieu thereof, defendants provide a one-year replacement warranty. But, based on the evidence presented, the court is unpersuaded that defendants' warranty policies are necessarily disclosed to consumers in a manner that is sufficient to ameliorate any confusion. Beltronics became aware of defendants' practices with respect to Beltronics radar detectors by way of customer warranty inquiries seeking to return units for repair, and those units appear to have come from defendants. This undercuts defendants' argument that they consistently disclose their warranty policy in a prominent manner. Moreover, the radar detectors which were seized do not contain any written disclosures concerning defendants' warranty policy. Additionally, the lack of a manufacturer's warranty is not the only implication associated with Beltronics products not bearing legitimate serial number labels. Customers also do not receive product and service assistance, product use information, software upgrades, rebates, and recalls. Thus, the court is unpersuaded that defendants' alleged disclosures to consumers concerning the product warranty are sufficient to ameliorate this confusion.

*Beltronics*, 522 F. Supp. 2d at 1328.

On appeal, Midwest raises several challenges to the district court's conclusion. First, it contends that the court impermissibly shifted the burden of proof to Midwest to demonstrate the effectiveness of its disclosure, as evidenced by the court's statement that it was "unpersuaded" that the disclosures sufficiently ameliorated consumer confusion. The record, however, clearly shows that the court understood that Beltronics, as the party seeking the preliminary injunction, bore the burden of proof. At the conclusion of the evidentiary hearing on the preliminary injunction, the court invited Beltronics to present evidence, explaining that "you get the last word because you bear the burden of proof." The court's use

of the word "unpersuaded" in its written order does not cause us to question the district court's earlier and unequivocal acknowledgment that Beltronics bore the burden of proof.

Next, Midwest argues that the court clearly erred in finding that it did not disclose adequately its warranty policies to consumers. Again, we disagree. The district court considered evidence that Midwest's consumers contacted Beltronics for warranty coverage, which calls into question whether Midwest included a warranty disclaimer in all of its sales advertisements. Midwest contends that the limited number of consumer complaints simply demonstrates that those consumers may not have read the disclosures. Midwest also states that it is equally likely that those consumers may have read the disclosures but tried to obtain warranty coverage from Beltronics anyway. Although those may be permissible findings in light of the evidence presented, so too is the district court's finding that Midwest did not consistently and prominently include the disclosures in its sales material. As such, the district court did not clearly err. *See Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1558 (10th Cir. 1996) ("Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.").[5]

---

[5]Midwest further argues that "the district court was simply wrong when it stated that 'the radar detectors which were seized do not contain any written disclosures concerning [Midwest's] warranty policy.'" Midwest points out that every radar detector it sold included a Beltronics warranty card, which states that

(continued...)

Moreover, to the extent that Midwest contends that the evidence of actual consumer confusion was de minimis and therefore insufficient for Beltronics to meet its burden, our case law clarifies that a plaintiff must demonstrate more than isolated instances of actual confusion when (1) the trademarked product and the defendant's product are not physically similar or are not used for similar purposes, or (2) the defendant has put on its own substantial evidence demonstrating no significant actual confusion—for example, testimony from consumers stating that they were not confused. *See Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1534–36 (10th Cir. 1994) (de minimis evidence of actual consumer confusion insufficient when the defendant introduced substantial and reliable evidence demonstrating no significant actual confusion and when the two marks are not similar); *King of the Mountain Sports*, 185 F.3d at 1092–93 (de minimis evidence of actual consumer confusion insufficient "in light of the complete lack of similarity between the defendants' uses and plaintiff's mark."). In this case, however, the two products at issue are nearly identical in all physical respects, they are used in the same manner, and Midwest did not offer any evidence showing that consumers were not confused. Therefore, we do not find this argument persuasive.

---

[5](...continued)
the Beltronics warranty does not apply to radar detectors lacking a serial number or purchased on eBay. The presence of the *Beltronics* warranty card, however, does not in any way undermine the district court's finding that the radar detectors did not come with a written explanation about *Midwest's* warranty policy.

Finally, Midwest maintains that the district court erred as a matter of law in concluding that the disclosure was insufficient because it only relates to warranty coverage and does not disclaim that Beltronics also refuses to provide "product and service assistance, product use information, software upgrades, rebates, and recalls." Midwest contends that if any disclaimer is necessary, it need only identify changes to the physical product itself. We reject this argument for the same reasons identified earlier in this opinion. The first sale doctrine is inapplicable when the resold product is materially different from the originally sold product. A difference is material if it influences the decision whether to purchase the product. *See Davidoff*, 263 F.3d at 1302. Beltronics provided evidence that consumers rely on its product and service assistance and that Midwest's simple replacement warranty does not provide the level of service expected by consumers. Thus, the district court did not err in concluding that the disclaimer did not sufficiently ameliorate the risk of consumer confusion on these points.

### III. CONCLUSION

The district court correctly determined that Beltronics demonstrated a substantial likelihood of success on the merits by showing a likelihood of consumer confusion. Accordingly, we AFFIRM the district court's order granting Beltronics's motion for preliminary injunction.