**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 7, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MRS. FIELDS FRANCHISING, LLC, a
Delaware limited liability company; MRS.
FIELDS FAMOUS BRANDS, LLC, a
Delaware limited liability company, d/b/a
Famous Brands International,

      Plaintiffs Counterclaim
      Defendants - Appellants,

v.

MFGPC, a California corporation,

      Defendant Counterclaimant -
      Appellee.

Nos. 19-4046 & 19-4063

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:15-CV-00094-JNP-DBP)**
_____

Avery Samet, Storch Amini, New York, New York (Rod N. Andreason, Kirton
McConkie, Salt Lake City, Utah, with him on the briefs), appearing for Appellant.

Brian M. Rothschild, Parsons Behle & Latimer, Salt Lake City, Utah, appearing for
Appellee.
_____

Before **BRISCOE**, **KELLY**, and **LUCERO**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

Plaintiffs and counterclaim-defendants Mrs. Fields Famous Brands, LLC (Famous Brands) and Mrs. Fields Franchising, LLC (Fields Franchising) appeal from the district court's order granting a preliminary injunction in favor of defendant and counterclaim-plaintiff MFGPC Inc. (MFGPC). In August 2018, the district court entered partial summary judgment in favor of MFGPC on its counterclaim for breach of a trademark license agreement that afforded MFGPC the exclusive use of the "Mrs. Fields" trademark on popcorn products. The district court's summary judgment order left only the question of remedy to be decided at trial. MFGPC then moved for a preliminary injunction, arguing that there was a substantial likelihood that it would prevail at trial on the remedy of specific performance. After conducting a hearing, the district court granted MFGPC's motion and ordered Fields Franchising to terminate any licenses it had entered into with other companies for the use of the Mrs. Fields trademark on popcorn products, and to instead comply with the terms of the licensing agreement it had previously entered into with MFGPC. Famous Brands and Fields Franchising argue in this appeal that the district court erred in a number of respects in granting MFGPC's motion for preliminary injunction. Exercising jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), we agree with appellants, and consequently reverse the district court's grant of a preliminary injunction in favor of MFGPC.

# I

## *The parties*

Famous Brands is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Broomfield, Colorado. The sole member of Famous Brands is Mrs. Fields Original Cookies, Inc. (MFOC), a Delaware corporation with its principal place of business in Salt Lake City, Utah. MFOC is not a party to this action.

Fields Franchising, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Salt Lake City, Utah. The sole member of Fields Franchising is Famous Brands.

Defendant MFGPC is a California corporation with its principal place of business in Mission Viejo, California.

## *The License Agreement and its relevant terms*

Fields Franchising owns the rights to the "Mrs. Fields" trademark and licenses those rights to allow other entities to manufacture, sell, and distribute products using the "Mrs. Fields" trademark.

On April 30, 2003, MFOC entered into a Trademark License Agreement (License Agreement) with LHF, Inc. (LHF), an affiliate of MFGPC. Aplt. App., Vol. 1 at 25, 45 (copy of actual agreement). On June 30, 2003, LHF assigned all rights under the License Agreement to MFGPC, and MFGPC agreed to be bound by and perform in accordance with the License Agreement. *Id.* at 25, 69 (copy of assignment). The License Agreement granted MFGPC a license to develop,

3

manufacture, package, distribute and sell prepackaged popcorn products bearing the "Mrs. Fields" trademark through all areas of general retail distribution. *Id.* at 46. The License Agreement prohibited MFOC from competing with MFGPC by making Mrs. Fields branded popcorn or licensing the right to use the Mrs. Fields trademark for use on popcorn. *Id.*, Vol. 5 at 866.

Section 5 of the License Agreement, entitled "LICENSE FEE AND ROYALTIES," required MFGPC to pay MFOC an "initial license fee" comprised of two payments: (1) $50,000 on or before June 1, 2003; and (2) an additional $50,000 on the "first anniversary of th[e] Agreement." *Id.*, Vol. 1 at 50. Section 5 also required MFGPC to pay MFOC "Guaranteed Licensing Fees and Running Royalties":

> Throughout the term (including Option Periods) of this Agreement the Running Royalty shall be 5% of Net Sales of Royalty Bearing Products. [MFGPC] shall remit such Running Royalties to [MFOC] on the last day of the month following the end of each calendar quarter covered by the Agreement. All Guaranteed Amounts and Running Royalties shall be non-refundable for any reason whatsoever.

*Id.*[1]

Section 6 of the License Agreement, entitled "GUARANTEED ROYALTY," required MFGPC to pay MFOC a "Guaranteed Royalty . . . per year on the Net Sales of Royalty Bearing Products during the initial term as set forth on the following schedule:

---

[1] The Definitions section of the License Agreement stated that "'Guaranteed Amounts' shall have the meaning set forth in Section 5 hereof." Aplt. App., Vol. 1 at 46. Section 5 of the License Agreement used the phrase "Guaranteed Amounts," but otherwise did not define it. *Id.* at 50.

## INITIAL TERM

| | |
|---|---|
| Year 1 | $       0.00 |
| Year 2 | $   50,000 |
| Year 3 | $ 100,000 |
| Year 4 | $ 100,000 |
| Year 5 | $ 100,000 |

*Id.* at 50. "Royalty Bearing Products" were defined in the License Agreement as "the food products described on Exhibit B hereto that are sold as prepackaged popcorn products using the Licensed Names and Marks." *Id.* at 48. Exhibit B to the License Agreement stated that "Royalty Bearing Products" were "[h]igh quality, pre-packaged, popcorn products." *Id.* at 67.

The License Agreement required MFGPC to "deliver to" MFOC quarterly and annual reports detailing "the amount of Royalty Bearing Products sold, including sufficient information and detail to confirm the [royalties] calculations." *Id.* at 51. It also required MFGPC to "provide [MFOC] a [monthly] summary of all written consumer complaints received regarding the quality of the Royalty Bearing Products." *Id.* at 52.

The "initial term" of the License Agreement began "upon the execution" of the License Agreement and "continue[d] for a period of sixty (60) months ('Initial Term')." *Id.* at 57. The License Agreement stated that, "[s]o long as [MFGPC] [wa]s not in material default and . . . ha[d] met and/or paid Running Royalties based on its Guaranteed Royalty," the License Agreement "would then automatically renew for successive five year terms ('Option Periods') until such time as either party

5

terminate[d] the Agreement upon no more than twenty (20) days prior written notice to the other party." *Id.*

The License Agreement stated, in pertinent part, that it could be terminated in the following manner:

> (i)     If [MFGPC] defaults in the payment of any Running Royalties then this Agreement and the license granted hereunder may be terminated upon notice by [MFOC] effective thirty (30) days after receipt of such notice, without prejudice to any and all other rights and remedies [MFOC] may have hereunder or by law provided, and all rights of [MFGPC] hereunder shall cease.

> (ii)    If [MFGPC] fails to pay its Guaranteed Royalty . . . , then, this Agreement and the license granted hereunder may be terminated upon receipt of such notice by [MFGPC], without prejudice to any and all other rights and remedies [MFOC] may have hereunder or by law provided, and all rights of [MFGPC] hereunder shall cease.

> (iii)   If [MFGPC] fails to perform in accordance with any material term or condition of this Agreement . . . and such default continues unremedied for thirty (30) days after the date on which [MFGPC] receives written notice of default, unless such remedy cannot be accomplished in such time period and [MFGPC] has commenced diligent efforts within such time period and continues such effort until the remedy is complete, then this Agreement may be terminated upon notice by [MFOC], effective upon receipt of such notice, without prejudice to any and all other rights and remedies [MFOC] may have hereunder or by law provided.

> &ast; &ast; &ast;

> (v)     If [MFOC] . . . files a petition in bankruptcy or for reorganization . . . , then this Agreement and the License granted hereunder may be terminated upon notice by [MFGPC], effective upon receipt of such notice, without prejudice to any and all other rights and remedies [MFGPC] may have hereunder or by law provided . . . .

> (vi)    If [MFOC] fails to perform in accordance with any material term or condition of this Agreement and such default continues unremedied for thirty (30) days after the date on which [MFOC]

6

receives written notice of default, then this Agreement may be terminated upon notice by [MFGPC], effective upon receipt of such notice, without prejudice to any and all other rights and remedies [MFGPC] may have hereunder or by law provided.

*Id.* at 57–58.

*MFOC's assignment of its rights under the License Agreement*

After entering into the License Agreement, MFOC assigned its rights and obligations under the License Agreement to Fields Franchising. *Id.* at 35; Dist. Ct. Docket No. 98 at 3 ("Counterclaim Defendants admit . . . that the rights of [MFOC] under the License Agreement were assigned to" Fields Franchising).

*The renewal of the License Agreement*

Fields Franchising and MFGPC continued to operate under the License Agreement through the end of 2014, a period of more than eleven years. According to MFGPC, it "paid the royalties required of it during the first term of the License Agreement, consisting of $450,000 in Guaranteed Royalties." Aplt. App., Vol. 1 at 35. MFGPC alleges that it owed no Guaranteed Royalties during the subsequent terms of the License Agreement, and instead was only required to pay Running Royalties. MFGPC also alleges that in 2013, Fields Franchising "required MFGPC to make a $50,000 investment in package design changes for its products which was obviously premised on the license being in full force and effect." *Id.*

*MFGPC's non-payment of Running Royalties in 2013*

"On January 13, 2013, there was a fire at a business next to MFGPC's chocolate drizzling co-packer." *Id.*, Vol. 2 at 319. "This left [the co-packer's] plant

7

filled with smoke and damaged most all of the Mrs. Fields inventory and packaging, rendering them valueless." *Id.* MFGPC alleges that Fields Franchising's CEO at that time, Neal Courtney, "was sympathetic to the position that MFGPC had been put in by the fire and he agreed that MFGPC could forego payment of Q4 2012 and all of 2013 Running Royalties until 2014 to assist it in getting its operations back into production and restarting its revenue streams." *Id.* at 319–320. Courtney disputes that he agreed to allow MFGPC to forego paying Running Royalties.

*Amounts owed by Fields Franchising and MFGPC in 2014*

Because of the accrued Running Royalties that it owed to Fields Franchising for the fourth quarter of 2012 and all of 2013, MFGPC delayed invoicing Fields Franchising and Famous Brands for orders of popcorn that MFGPC shipped directly to them for resale in March and September of 2014. The accrued Running Royalties were allegedly less than the combined open invoices payable from Fields Franchising and Famous Brands to MFGPC. By December 2014, Fields Franchising and Famous Brands together effectively owed MFGPC a balance of $26,660.43.

*Fields Franchising's notice of termination and MFGPC's response*

On December 22, 2014, Fields Franchising's counsel sent a letter to MFGPC notifying MFGPC that Fields Franchising considered the License Agreement to not have automatically renewed in 2013 due to MFGPC's failure to pay royalties since the third quarter of 2012, and also due to MFGPC's alleged failure to comply with the terms of the License Agreement. Fields Franchising's counsel further asserted

8

that, to the extent the License Agreement had automatically renewed, Fields Franchising intended to terminate the License Agreement.

MFGPC's counsel responded by letter on January 19, 2015, disputing Fields Franchising's authority to terminate the License Agreement, alleging that no royalties were due by MFGPC to Fields Franchising, further alleging that Fields Franchising and Famous Brands owed MFGPC $26,660.43, and indicating MFGPC's intent to hold Fields Franchising responsible for damages arising from the wrongful termination. According to MFGPC, the result of Fields Franchising's December 22, 2014 letter is that MFGPC has been effectively prevented from marketing and shipping its prepackaged popcorn products.

Fields Franchising did not respond to MFGPC's letter. Instead, as discussed below, Fields Franchising filed this action against MFGPC.

*Fields Franchising's acquisition of Maxfield's Candy Company*

On December 24, 2014, two days after its counsel notified MFGPC of the intent to terminate the License Agreement, Fields Franchising issued a press release announcing its acquisition of Maxfield's Candy Company. The press release stated that, with the acquisition, Fields Franchising was acquiring the "Nutty Guys" premium brand of "popcorn products." *Id.* It is unclear from the record what, if anything, Fields Franchising subsequently did with that brand.

*Fields Franchising's agreement with Perfect Snax*

On September 22, 2017, while MFGPC's initial appeal was pending before this court (that initial appeal is discussed below), Fields Franchising entered into a

9

new license agreement with Perfect Snax Prime, LLC (Perfect Snax), granting Perfect Snax a license to market and sell popcorn using the Mrs. Fields trademark. Fields Franchising subsequently terminated the licensing agreement with Perfect Snax on August 7, 2018. On August 27, 2018, seven days after the district court entered partial summary judgment in favor of MFGPC, Fields Franchising entered into a reinstatement agreement with Perfect Snax that effectively reinstated Perfect Snax's license under slightly more onerous terms than were contained in the original agreement. Perfect Snax has plans to distribute a cookie popcorn product, called CookiePop, that uses the Mrs. Fields trademark.

## II

### *Fields Franchising's complaint*

On February 10, 2015, Fields Franchising initiated this diversity action by filing a complaint against MFGPC in the United States District Court for the District of Utah. The complaint sought a declaratory judgment "that the License Agreement [w]as . . . properly terminated and [wa]s no longer in effect." *Id.*, Vol. 1 at 29. The complaint also sought "contractual attorneys' fees and costs." *Id.*

### *MFGPC's counterclaim and cross-claims*

On February 24, 2015, MFGPC filed a counterclaim and cross-claims against Fields Franchising, Famous Brands, and Mrs. Fields Confections, LLC (MFC). The first claim for relief alleged breach of the License Agreement by Fields Franchising. The second claim for relief sought payment of $26,660.43 allegedly due from Famous Brands to MFGPC for merchandise that MFGPC had "prepared, packaged,

10

and shipped" to Famous Brands "for sale by [Famous Brands] to its customers." *Id.* at 39. The third claim alleged intentional interference with prospective economic advantage against Famous Brands and MFC. The fourth claim alleged negligent interference with prospective economic advantage against Famous Brands and MFC. The fifth claim alleged breach of the implied covenant of good faith and fair dealing against Fields Franchising and Famous Brands.

*MFGPC's motion for TRO and preliminary injunction*

On February 27, 2015, MFGPC filed a motion for temporary restraining order and preliminary injunction "prohibiting [Fields Franchising] from interfering with the right and ability of MFGPC to sell pre-packaged popcorn products bearing the 'Mrs. Fields' trademark and trade name" under the License Agreement. *Id.* at 72. The district court held a hearing on the motion on March 30, 2015, and, at the conclusion of the hearing, denied the motion.

*The initial judgment in favor of Fields Franchising*

In late 2015 and early 2016, the district court "granted a motion to dismiss MFGPC's claims and allowed [Fields Franchising] to voluntarily dismiss its own claim for a declaratory judgment." *Mrs. Fields Franchising, LLC v. MFGPC*, 721 F. App'x 755, 757 (10th Cir. 2018). The district court subsequently issued an order granting Fields Franchising's motion for judgment and award of attorney fees.

*This court's reversal and remand*

MFGPC appealed. On January 8, 2018, this court issued an order and judgment (a) affirming Fields Franchising's voluntary dismissal of its claim for

11

declaratory judgment, (b) affirming the dismissal of MFGPC's account-stated claim "because MFGPC failed to plead an essential element," and (c) reversing the dismissal of MFGPC's breach of contract claim "because [MFGPC's] allegations in the complaint state[d] a plausible basis for relief." *Id.*

*The parties' summary judgment motions*

On remand, the parties moved for summary judgment with respect to MFGPC's counterclaim for breach of contract. On August 20, 2018, the district court issued a memorandum decision and order denying Fields Franchising's motion for summary judgment and granting in part MFGPC's motion for summary judgment. The district court found that (a) "MFGPC paid the Guaranteed Royalty in full during the Initial Term," (b) "[i]n June 2008, at the end of the Initial Term, the Agreement automatically renewed for a five-year Option Period that ran from June 1, 2008 to April 30, 2013," (c) "[t]he parties continued to perform under the Agreement, and it automatically renewed for another five-year Option Period in June 2013 that ran from June 1, 2013 to April 30, 2018." Aplt. App., Vol. 2 at 317. The district court in turn concluded that the December 22, 2014 letter sent by Fields Franchising's counsel to MFGPC "was inaccurate for a number of reasons." *Id.* To begin with, the district court noted, "there was no requirement that MFGPC pay 'a Guaranteed Royalty of $100,000 a year.'" *Id.* Rather, the district court concluded, "[t]he Guaranteed Royalty [wa]s defined as four payments that MFGPC was required to make during the Initial Term." *Id.* Second, the district court concluded that "[t]he second Option Period ended in 2013, not 2012." *Id.* Third, the district court concluded that the

12

License "Agreement *did* automatically renew at the end of the second Option Period, and MFGPC therefore retained a license to manufacture and sell 'Mrs. Fields' branded popcorn." *Id.* at 317–18 (emphasis in original). Fourth, the district court concluded that "the Agreement could not be terminated 'pursuant to Section 16(b)(ii) [based on] MFGPC's failure to pay Guaranteed Royalties,' because MFGPC had paid the Guaranteed Royalty in full." *Id.* at 318. The district court noted that, although MFGPC's counsel sent a letter to Fields Franchising on January 19, 2015, explaining the inaccuracies in Fields Franchising's counsel's December 22, 2014 letter, Fields Franchising "never responded and instead filed suit less than a month later." *Id.* at 319.

The district court in turn concluded that Fields Franchising's "actions—sending the notice of termination [letter] and then refusing to respond to MFGPC's letter—unequivocally indicated that [Fields Franchising] no longer intended to perform under the [License] Agreement." *Id.* at 332. The district court further concluded that Fields Franchising "had no right to terminate the [License] Agreement under Section 16(b)(ii) because MFGPC had paid the Guaranteed Royalty in full." *Id.* The district court rejected, as inconsistent "with the plain language of the [License] Agreement," Fields Franchising's assertion "that MFGPC was required to pay 'Running Royalties in an amount equal to the Guaranteed Royalty' during the Option Periods." *Id.* The district court also concluded that, "[b]ecause Section 16(b)(ii) [wa]s not applicable," Fields Franchising "would need to rely on either Section 16(b)(i) or (b)(iii) to justify the notice of termination." *Id.* at 334. "But

13

neither" of those subsections, the district court noted, gave Fields Franchising "the right to terminate the Agreement effective immediately, so [Fields Franchising] necessarily breached the Agreement by purporting to terminate it immediately." *Id.* Lastly, the district court rejected Fields Franchising's assertion that MFGPC had breached the License Agreement in other ways, including by failing to pay Running Royalties. The district court noted that "[t]he undisputed testimony of [MFGPC's CEO] establishe[d] that the parties had a practice of offsetting amounts [Fields Franchising or its affiliates] owed for popcorn against the amount MFGPC owed in Running Royalties." *Id.* at 335.

Ultimately, the district court concluded that MFGPC "ha[d] established the first three elements of its counterclaim: (1) the parties' relationship was governed by a valid contract, the Licensing Agreement; (2) MFGPC substantially performed under the Agreement; and (3) [Fields Franchising] improperly repudiated the Agreement, thereby committing an actionable breach." *Id.* at 340. The district court further concluded that "[t]he only issue that remain[ed] [wa]s damages." *Id.* And the district court concluded that the damages issue had to "be resolved through a subsequent motion or at trial." *Id.* at 339.

*MFGPC's motion for preliminary injunction*

On October 13, 2018, MFGPC filed a motion for temporary restraining order and preliminary injunction seeking specific performance of the License Agreement. In its motion, MFGPC asserted that Fields Franchising was "continu[ing] to license and market competing products using the Trademark in contravention of the terms of

14

the . . . License Agreement." *Id.* at 345. MFGPC further asserted that it would suffer irreparable harm unless the district court ordered Fields Franchising

> to once again recognize [MFGPC] as the exclusive worldwide manufacturer and distributor of Mrs. Fields-branded popcorn, forward all popcorn orders to [MFGPC], resume sales and orders of [MFGPC's]s products for their stores, and cease manufacturing, purchasing, and ordering popcorn from competitors.

*Id.* at 345–346. Fields Franchising opposed MFGPC's motion.

The district court held a hearing on MFGPC's motion on January 14, 2019. On March 20, 2019, the district court issued a memorandum decision and order granting a preliminary injunction in favor of MFGPC. The district court found, in pertinent part, that "[t]he rights granted to MFGPC under the . . . License Agreement [we]re valuable to MFGPC because . . . MFGPC's license was effectively perpetual absent material breach . . . ." *Id.*, Vol. 5 at 870. The district court in turn concluded that "[c]alculating damages for [Fields Franchising's] wrongful termination of MFGPC w[ould] be difficult, if not impossible." *Id.* at 871. The district court noted, in part, that "[c]alculating damages for permanent deprivation of the license w[ould] be practically impossible and would require speculation because there [wa]s no comparable transaction in the marketplace," and because "proxy measures like prior performance [we]re of limited use because they [we]re tainted by the great recession preceding the breach and by a fire that significantly disrupted MFGPC's ability to ship its product." *Id.* at 871–72. The district court therefore concluded it was "highly unlikely that MFGPC could be made whole through an award of money damages because (a) it would be difficult if not impossible to accurately calculate the

15

damages to MFGPC of being permanently deprived of the right to use the Mrs. Fields Trademark for popcorn; and (b) no license for a comparable brand on such favorable terms could be obtained." *Id.* at 876–77. Ultimately, the district court concluded that "MFGPC ha[d] established a strong likelihood that [the district] court w[ould] order specific performance by [Fields Franchising] of the . . . License Agreement." *Id.* at 878. "Thus," the district court "conclude[d] that MFGPC [wa]s likely to succeed on the merits of its claim for equitable relief." *Id.*

As for irreparable harm, the district court concluded that, "[i]n the absence of an injunction, MFGPC w[ould] be deprived of an opportunity to distribute a unique product—Mrs. Fields-branded popcorn." *Id.* at 879. In other words, it concluded, Fields Franchising "would be free to license to other third-parties, and MFGPC would suffer a further diminishment of its competitive position in the marketplace." *Id.* The district court also concluded that "MFGPC (and the court) would have extreme difficulty calculating damages for the future and permanent deprivation of MFGPC's right to exclusive use of the Trademark for selling Mrs. Fields Branded Popcorn," and "[t]he speculative nature of calculating damages w[ould] only increase over time." *Id.* "Thus, the [district] court conclude[d] that MFGPC w[ould] suffer irreparable harm if the temporary injunction w[as] denied." *Id.*

As for the balance of harms, the district court noted that Fields Franchising "w[ould] be harmed because it w[ould] not be able to continue its business relationship with Perfect Snax." *Id.* The district court concluded, however, that "[a]ny harm to [Fields Franchising] ar[ose] from either (1) [Fields Franchising's]

16

initial breach of the . . . License Agreement, or (2) [Fields Franchising's] decision to reinstate the Perfect Snax Agreement *after* [the district] court granted MFGPC's motion for Summary Judgment against Mrs. Fields." *Id.* at 880 (emphasis in original). The district court also noted that Fields Franchising "wrongly breached the Agreement with MFGPC in attempting to terminate the Agreement." *Id.* The district court concluded that, "[i]n light of its behavior, [Fields Franchising could not] rely on the harm that w[ould] be caused by the termination of its agreement as a reason for denying an injunction." *Id.* The district court also concluded that Fields Franchising could not "rely on any harm to Perfect Snax" because Fields Franchising "ha[d] the contractual right to terminate its licensing agreement with Perfect Snax based on Perfect Snax's failure to abide by the terms of that agreement." *Id.* The district court further noted that "any harm to Perfect Snax arising from an injunction was caused by [Fields Franchising] and not MFGPC." *Id.* The district court in turn concluded that, "to the extent that Perfect Snax's rights [would] be affected by an injunction, Perfect Snax must seek compensation from [Fields Franchising]." *Id.* at 881.

Lastly, the district court "conclude[d] that the public has a strong interest in honoring and enforcing lawful contractual obligations," and that "[t]he public interest favor[ed] the issuance of MFGPC's requested injunction, especially as this injunction will discourage [Fields Franchising] from engaging in the type of behavior it has in the past." *Id.*

The district court ordered Fields Franchising to, within thirty days of the date of the order, (a) "refrain from using the Mrs. Fields Trademark in association with Mrs. Fields-branded popcorn in accordance with the . . . License Agreement," (b) "refrain from licensing any third parties to use the Mrs. Fields Trademark in association with Mrs. Fields-branded popcorn," "(c) "terminate any licenses and purported licenses to third parties to manufacture, market, and sell Mrs. Fields-branded popcorn," (d) "recognize MFGPC as the exclusive worldwide licensee and source of Mrs. Fields-branded popcorn," (e) "enforce MFGPC's exclusive right to use the Trademark in the world-wide territory in good faith," (f) "forward all orders received for Mrs. Fields-branded popcorn to MFGPC for fulfillment," (g) "if [Fields Franchising] chooses to sell Mrs. Fields-branded popcorn, to resume selling exclusively MFGPC-manufactured Mrs. Fields-branded popcorn; and (h) "remove or cause to be removed all competing Mrs. Fields-branded popcorn using the Mrs. Fields Trademark from sale, including from all retailers and online distributors, worldwide." *Id.* at 882–883.

*Fields Franchising's notice of appeal*

Fields Franchising filed a timely notice of appeal from the district court's memorandum decision and order granting preliminary injunction in favor of MFGPC.

III

Fields Franchising argues in this appeal that the district court erred in granting a preliminary injunction in favor of MFGPC. In support, Fields Franchising argues that the district court erred in finding that the License Agreement afforded MFGPC a

18

"perpetual license." Fields Franchising further argues that the district court erred in its analysis of each of the requirements for imposition of a preliminary injunction. As discussed below, we agree with Fields Franchising that the district court erred in finding that the License Agreement afforded MFGPC a "perpetual license." And we in turn conclude that this error fatally infected the district court's analysis of the requirements for imposing a preliminary injunction

*Legal standards governing preliminary injunctions*

"'A preliminary injunction is an extraordinary remedy, the exception rather than the rule.'" *Free the Nipple–Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (quotations omitted). "To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that she's 'substantially likely to succeed on the merits,' (2) that she'll 'suffer irreparable injury' if the court denies the injunction; (3) that her 'threatened injury' (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest.'" *Id.* (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)).

"But courts 'disfavor' some preliminary injunctions and so require more of the parties who request them." *Id.* (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005)). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial." *Id.* "Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the

19

moving party could expect from a trial win." *Id.* "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor." *Id.* (quotations omitted).

"District courts have discretion over whether to grant preliminary injunctions, and we will disturb their decisions only if they abuse that discretion." *Id.* at 796 (citations omitted). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.* "As we review a district court's decision to grant or deny a preliminary injunction, we thus examine the court's factual findings for clear error and its legal conclusions de novo." *Id.* at 796–797.

*The district court's erroneous finding of a "perpetual license"*

We begin our analysis by turning to the factual findings made by the district court in its memorandum decision and order granting a preliminary injunction in favor of MFGPC. Most of those findings simply recount the history of the relationship between Fields Franchising and MFGPC and are undisputed. One key finding, however, is disputed by Fields Franchising. In Paragraph 23 of its factual findings, the district court stated: "The rights granted to MFGPC under the Trademark License Agreement are valuable to MFGPC because . . . MFGPC's license was *effectively perpetual* absent material breach . . . ." Aplt. App., Vol. 5 at 870 (emphasis added). Fields Franchising argues, and we agree, that this finding is

20

clearly erroneous because the License Agreement did not, in fact, afford MFGPC a perpetual license.

Section 16 of the License Agreement was titled "TERM AND TERMINATION." *Id.*, Vol. 1 at 57. Section 16(a), entitled "Term," specified that "[t]he initial term of th[e] Agreement" was sixty months. *Id.* Section 16(a) in turn stated that, "[s]o long as [MFGPC] was not in material default," the Agreement "would then automatically renew for successive five year terms ('Option Periods') until such time as either party terminates the Agreement upon no more than twenty (20) days prior written notice to the other party." *Id.* In other words, this provision of Section 16(a) allowed either party to prevent the License Agreement from renewing at the end of each five-year period even in the absence of default or breach. Section 16(b), entitled "Termination," outlined a set of six specific circumstances under which Fields Franchising and MFGPC could otherwise terminate the License Agreement (as opposed to preventing it from renewing). *Id.* For example, Section 16(b)(iv) authorized Fields Franchising to terminate the License Agreement at any time if MFGPC was "determined to be insolvent" or "file[d] a petition in bankruptcy." *Id.* Read as a whole, Section 16 authorized Fields Franchising and MFGPC (a) to prevent the License Agreement from renewing at the end of each five-year period, and (b) to terminate the License Agreement at other points in time if specific circumstances occurred. In other words, as Fields Franchising asserts in its opening brief, reading Section 16 as a whole "means that the [License] Agreement c[ould] be terminated without cause prior to each five-year renewal and mid-term,

21

[and] with cause only upon specified [circumstances and] procedures." Aplt. Br. at 31.

Thus, contrary to the district court's finding, nothing in Section 16 afforded MFGPC a "perpetual license." Rather, at best, MFGPC could have reasonably expected only to continue using the license so long as Fields Franchising was interested in allowing the License Agreement to automatically renew, and so long as none of the specific circumstances outlined in Section 16(b) occurred and prompted Fields Franchising to terminate the License Agreement. As the undisputed facts make clear, however, Fields Franchising clearly did not intend to proceed with the License Agreement and it notified MFGPC of this fact. Even though Fields Franchising may have breached the License Agreement by failing to comply with the non-renewal procedure outlined in Section 16(a),[2] it is apparent that Fields Franchising would not have allowed the License Agreement to renew again. Indeed, we essentially noted this fact in our earlier opinion: "the [L]icense [A]greement would have allowed MFGPC to continue to sell the popcorn for roughly [2.5] more years in the absence of a termination" by Fields Franchising. *Mrs. Fields Franchising*, 721 F. App'x at 760–761.

---

[2] The district court reached this conclusion in granting summary judgment in favor of MFGPC on its breach of contract claim. Because that ruling is not before us in the interlocutory appeal, we do not reach the merits of it. Instead, we simply assume, without deciding, that Fields Franchising's actions breached the License Agreement.

22

As we shall proceed to discuss, the district court's erroneous finding that the License Agreement afforded MFGPC a "perpetual license" impacted its analysis of MFGPC's likelihood of success on the merits and the existence of irreparable harm. More specifically, we conclude that the district court's analysis of both of these requirements is fatally flawed.

*Likelihood of success - specific performance*

The district court concluded that MFGPC "met its burden of showing a likelihood that the court w[ould] order [Fields Franchising] to reinstate the [L]icens[e] [A]greement with MFGPC." Aplt. App., Vol. V at 875. In support of this conclusion, the district court noted that, "[u]nder Utah law, a party seeking specific performance must prove 1) that a contract exists; 2) that the essential terms of the contract are clear and definite; and 3) that there is no adequate remedy at law." *Id.* (citing *Tooele Assocs. Ltd. v. Tooele City*, 251 P.3d 835, 835 (Utah 2011) and *South Shores Concession v. State*, 600 P.2d 550, 552 (Utah 1979)). Focusing on the last prong of this test, the district court concluded that calculating "damages due to" Fields Franchising's breach of the License Agreement would be "very difficult, if not impossible." *Id.* at 876. More specifically, the district court concluded it was "highly unlikely" that "MFGPC could be made whole through an award of money damages because . . . it would be difficult if not impossible to accurately calculate the damages to MFGPC of being *permanently deprived* of the right to use the Mrs. Fields Trademark for popcorn . . . ." *Id.* at 876–77 (emphasis added). The district court

23

also concluded that "no license for a comparable brand on such favorable terms could be obtained." *Id.* at 877.

Fields Franchising argues on appeal, and we agree, that the district court's likelihood of success analysis was flawed because it rested, in significant part, on the erroneous finding that the License Agreement afforded MFGPC a perpetual license. Specifically, the district court's reference to "permanent deprivation" quite clearly rested on the district court's finding that the License Agreement gave MFGPC a "perpetual license." Although we have no doubt that it would be difficult to calculate damages for a permanent deprivation of a license, that is simply not the case here. Rather, as this court previously noted, it appears that MFGPC's damages will be limited to a period of approximately two-and-a-half years (i.e., the remainder of the third five-year term of the License Agreement). And, as we shall discuss below, we are not persuaded that calculating such damages will be impossible. Consequently, we conclude the district court erred in determining that MFGPC established a strong likelihood that it will prevail on its claim for specific performance.

*Irreparable harm*

Generally speaking, the "breach of an exclusivity clause almost always warrants the award of injunctive relief." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004). That said, "the breach of an exclusivity provision alone" does not "satisf[y] the irreparable harm factor of the preliminary injunction test." *Id.* In other words, "[d]espite the general acknowledgment that irreparable harm often arises from the breach of [an

24

exclusivity] agreement, courts do not automatically, nor as a matter of course, reach this conclusion." *Id.* at 1263. "Rather, they have identified the following as factors supporting irreparable harm determinations: inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Id.* (citing cases).

Here, the district court concluded that MFGPC "w[ould] be irreparably harmed should the court fail to enter an injunction." Aplt. App., Vol. 5 at 878. In support of this conclusion, the district court stated, in pertinent part: "MFGPC (and the court) would have extreme difficulty calculating damages for the future and *permanent deprivation* of MFGPC's right to exclusive use of the Trademark for selling Mrs. Fields Branded Popcorn." *Id.* at 879 (emphasis added). The district court also stated that the terms of the License Agreement were "unusually licensee-friendly and would be difficult, if not impossible, to obtain in today's licensing environment." *Id.* at 871.

These references, we conclude, indicate that the district court rested its irreparable harm analysis, at least in part, on its erroneous finding that the License Agreement afforded MFGPC a perpetual license. MFGPC could only have suffered a "permanent deprivation" if the License Agreement afforded it a perpetual license. As previously discussed, however, the License Agreement did not do so. As for the district court's reference to "unusually license-friendly" terms, the district court did not identify what those terms were, and we, having carefully examined the License

25

Agreement, are left to conclude that the district court was referring only to its erroneous conclusion that the License Agreement afforded MFGPC a perpetual license. Even assuming, for purposes of argument, that the License Agreement was "unusually licensee-friendly" in some other respect, the fact remains that the License Agreement was not permanent in nature and it expressly afforded Fields Franchising the right to terminate it. Thus, we conclude that the difficulty that MFGPC may face in obtaining a similar agreement with another company simply is not a proper factor to consider in determining whether irreparable harm exists.

The district court also, in discussing the issue of irreparable harm, pointed to two other factors. First, the district court concluded that "MFGPC's prior profitability" was not "a good prediction of its future profitability because the great recession and the warehouse fire reduced its profits prior to the breach." Aplt. App., Vol. 5 at 876. Second, and relatedly, the district court noted that "there [we]re no comparable products from which [MFGPC's] damage could be estimated." *Id.* We are not persuaded, however, that these factors support the district court's irreparable harm determination.

Generally speaking, "evidence of past profits in an established business" is the best "proof of future profits." *Palmer v. Conn. Ry. & Lighting Co.*, 311 U.S. 544, 559 (1941). Here, it is undisputed that the parties operated under the terms of the License Agreement for nearly twelve years. Presumably, MFGPC's financial statements for all of those years are or will be available to the district court for

26

assistance in calculating MFGPC's damages.[3] The district court questioned the validity of such proof in this case "because," it stated, "the great recession and the warehouse fire reduced [MFGPC's] profits prior to [Fields Franchising's] breach." Aplt. App., Vol. 5 at 876. It is unclear to us, however, how the district court arrived at this conclusion. The "great recession" mentioned by the district court did not begin until approximately December of 2007, more than four years into the original term of the License Agreement, and ended in June of 2009, approximately four-and-a-half years prior to Fields Franchising's decision to terminate the License Agreement. *See* Robert Rich, *The Great Recession* (Nov. 22, 2013), federalreservehistory.org/essays/great_recession_of_200709. Precisely why the years prior to or following the recession cannot serve as a reasonable proxy to determine MFGPC's damages is unclear and was not discussed at all by the district court. Similarly, the warehouse fire that was mentioned by the district court did not occur until January 13, 2013, over ten years into the parties' continuing business relationship, and approximately three-and-a-half years after the end of the recession. Setting aside the period of the great recession and the period following the warehouse fire, that leaves a total of approximately eight years and three months' worth of sales data of MFGPC's own products for the district court to consider for purposes of

---

[3] According to Fields Franchising, the record before the district court included MFGPC's "financial statements for the six years pre-termination showing its revenues, costs and profits for each year." Aplt. Br. at 25. There is no suggestion by MFGPC that additional years of financial statements are unavailable.

calculating damages.[4]  Nothing in the record or in MFGPC's briefs persuades us that this data cannot serve as a reasonable measure of MFGPC's damages.

As for the purported lack of comparable products, we conclude that is irrelevant, given the fact that there appears to be a wealth of actual data regarding the sales of MFGPC's own products.

For these reasons, we conclude that the district court's irreparable harm analysis was flawed and that, contrary to its conclusion, MFGPC failed to establish the existence of irreparable harm.

*Balance of harms and public interest*

Having concluded that MFGPC failed to establish a likelihood of success on the merits of its claim for specific performance, or, relatedly, the existence of irreparable harm, it is unnecessary for us to address the remaining two requirements for the imposition of a preliminary injunction.

III

We therefore REVERSE the preliminary injunction entered by the district court in favor of MFGPC.

---

[4] The period from April 2003 until December 2007 (excluding December 2007) yields a total of four years and eight months.  The period from June 2009 through January 2013 (excluding January 2013) yields a total of three years and seven months.  Together, this results in a total of eight years and three months.

28